**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **EDWARD NELSON and** | : | |
| **PATRICIA NELSON,** | : | |
|     **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:09-cv-1690 (VLB)** |
| **CITY OF STAMFORD, et al.** | : | |
|     **Defendants.** | : | **January 25, 2012** |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [Dkt. #141, #144]**

      Plaintiffs, Edward and Patricia Nelson, filed a twenty-one count complaint which fails to present a clear and concise statement of the facts supporting any claim. The complaint consists of a litany of facts, inferences and legal conclusions, followed by allegations of twenty-one specific causes of action all predicated upon the exact same litany of facts, inferences and legal conclusions. Plaintiffs' claims arose out of an incident at a bar in Stamford, Connecticut on October 22, 2006. Both Patricia and Edward Nelson were arrested after a security officer at the bar reported witnessing Edward strike Patricia outside the bar.

      Although the Court is challenged to construe the complaint as making out any cause of action other than excessive force violations on behalf of both Patricia and Edward Nelson pursuant to 28 U.S.C. §1983 as guaranteed by the Fourth Amendment, the Plaintiffs appear to raise many additional claims, including strip searches in violation of the Fourth Amendment pursuant to 28 U.S.C. §1983, several Connecticut common law causes of action, including

1

Recklessness and Negligence, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Assault and Battery, False Imprisonment, and several others.

Currently pending before the Court is a Motion for Summary Judgment filed by all Defendants, City of Stamford, Chief Brent B. Larrabee, Lieutenant Francis Cronin, Lieutenant William Watrous, Sergeant Thomas J. Scanlon, Sergeant Kevin Fitzgibbons, Sergeant Christian DiCarlo, Sergeant Louis DeRubeis, Police Officer David Dogali, Police Officer Michael Connelly, Police Officer Brendetta Baines, and Police Officer Mark Ligi as to all claims brought against them by Patricia and Edward Nelson in the Third Amended Complaint pursuant to Fed. R. Civ. P. 56(a).

I.     Factual Background

The following facts relevant to Defendants' motion for summary judgment are undisputed unless otherwise noted.[1]

The parties agree that on October 22, 2006 at t 12:39 am, Anthony Hinton, a security officer at the club, flagged down Defendant Stamford Police Officer Dogali who was driving down Greenwich Avenue in front of the club while on patrol in the area. [Dkt. #160, Ex. 29, Defendant Dogali Stamford Police Incident Report]. Hinton informed Defendant Dogali that he observed Plaintiffs, Edward and Patricia Nelson, arguing outside of the club, culminating in Edward punching

---

[1] All of the exhibits attached to Plaintiff Patricia Nelson's Memorandum in Opposition to Summary Judgment are also filed as exhibits attached to Plaintiff Edward Nelson's Memorandum in Opposition to Summary Judgment. Therefore, when referencing an exhibit which has been attached to both Plaintiffs' Memoranda, the Court will provide only one citation, rather than cite to the same exhibit in each Plaintiffs' Memorandum.

Patricia in the face. [*Id.*].  Hinton reported that approximately 10 to 12 patrons in front of the club also observed the incident. [*Id.*].  Hinton then identified Edward Nelson, who was walking back towards the club, as the man who was involved in the altercation at issue. [*Id.*].

Defendant Dogali then approached Edward Nelson and attempted to ask him if he was involved in a dispute with a female. [Dkt. #160, Ex. 29, Defendant Dogali Stamford Police Incident Report].  Defendant Dogali indicated in his incident report that Edward Nelson became immediately hostile and refused to answer any questions.  Mr. Nelson was heavily under the influence of alcohol. [Dkt. #160, Ex. 46, Stamford Hospital Medical Record]. Defendant Dogali further reports that as he attempted to place Edward Nelson under arrest, Patricia Nelson approached them screaming that she wanted to have Edward Nelson arrested and that she intended to press charges against him. [*Id.*].  Relying on the initial complaint from Hinton along with Hinton's identification of Mr. Nelson, Defendant Dogali then advised Mr. Nelson that he was under arrest for 3rd Degree Assault and 2nd Degree Breach of Peace, and asked Mr. Nelson to place his arms behind his back. [*Id.*].  After Mr. Nelson ignored this instruction, Defendant Dogali grabbed Mr. Nelson's right arm and placed it behind his back, applying one handcuff on Mr. Nelson's right arm. [*Id.*].  Defendant Dogali then asked Mr. Nelson to place his left arm behind his back. [*Id.*].  After Mr. Nelson again refused to comply with the instruction, Defendant Dogali attempted to place Mr. Nelson's left hand behind his back, but was unable to overpower Mr. Nelson. [*Id.*]; [Dkt. #141, Ex.5, Affidavit of Defendant Dogali, ¶¶7-8].  Defendant Dogali weighed around one

hundred ninety pounds (190) at the time of the arrest, and Defendant Dogali found Mr. Nelson to be much heavier and more powerful. [Dkt. #141, Ex. 4, Affidavit of Defendant Dogali, ¶5].   Defendant Dogali felt that with a handcuff on only one or Mr. Nelson's writs and the other hand swinging loosely, he was presented with a dangerous situation exposing himself and potential bystanders to serious injury if Mr. Nelson began to swing his right arm. [*Id.* at ¶9].

While Defendant Dogali was placing Mr. Nelson under arrest, Defendant Stamford Police Officer Connelly arrived on the scene. [Dkt. #160, Ex. 29, Defendant Dogali Stamford Police Incident Report].  As Defendant Dogali attempted to handcuff Mr. Nelson, Mrs. Nelson approached and lunged at Defendant Dogali. [*Id.*].  Mrs. Nelson was heavily under the influence of alcohol. [Dkt. #160, Ex. 46, Stamford Hospital Medical Records for Patricia Nelson]. Officer Connelly grabbed Mrs. Nelson as she moved towards Defendant Dogali. Defendant Sergeant Scanlon then arrived on the scene and observed Mr. Nelson screaming and struggling with Defendant Dogali, attempting to place his left arm in handcuffs.  [*Id.*]; [Dkt. #159, Ex. 34, Defendant Sergeant Scanlon Stamford Police Incident Report]. Defendant Scanlon advised Mr. Nelson that if he did not comply with the Officers' instructions a Taser would be used. [Dkt. #160, Ex. 29]; [Dkt. #159, Ex. 34].  Defendant repeated the warning a second time. [Dkt. #159, Ex. 34].  After Mr. Nelson again refused to comply, Defendant Scanlon applied the Taser to Mr. Nelson's left leg and the Officers were able to handcuff Mr. Nelson's left arm. [Dkt. #160, Ex. 29]; [Dkt. #159, Ex. 34].  Mr. Nelson was then transported to the Stamford Police Department. [Dkt. #160, Ex. 29].

After intercepting Mrs. Nelson's lunge at Defendant Dogali, Defendant Connelly attempted to place Mrs. Nelson in handcuffs. [Dkt. #160, Ex. 27, Defendant Connelly Stamford Police Incident Report].  Defendant Connelly reports that Mrs. Nelson attempted to break free of his grip, pulling her right arm violently away from him and continuing to move towards Defendant Dogali screaming "get off me mother fucker." [*Id.*].  Defendant Connelly then pushed Mrs. Nelson against a parked vehicle and attempted to place handcuffs on her. [*Id.*].  Mrs. Nelson struggled to break free, and after several attempts Defendant Connelly secured her in handcuffs, placed her in his patrol vehicle, and transported her to the Stamford Police Department. [*Id.*].

Plaintiffs, Mr. and Mrs. Nelson, vehemently dispute this version of their arrests. Instead, Mr. Nelson contends that Defendant Sergeant Scanlon "conspired with the other officers to make up a narrative" where Mr. Nelson and his wife were "fighting with the officers and there was this big struggle," but actually Mr. Nelson and his wife were not in the same location. [Dkt. #160, Ex. 33, Dep. of Edward Nelson, 11:20-25].

Mr. Nelson admits that he was approached by Defendant Dogali and asked if he was involved in a dispute with a female. [Dkt. #159, Ex. 1, Pl. Edward Nelson's Rule 56(a)(2) Stmt., ¶3].  Mr. Nelson admits that he stated that he was studying to be an attorney and did not need to answer Defendant Dogali's questions. [*Id.* at ¶4].  Mr. Nelson admits that he passively resisted being placed in handcuffs. [Dkt. #159, Ex. 22, Deposition of Edward Nelson, 20:4-8].  Mr. Nelson contends the Taser was deployed on him for no reason and he was assaulted by

the Officers. [Dkt. #160, Ex. 16, Affidavit of Edward Nelson, ¶16].  Mr. Nelson admits that he was found guilty of Interfering with an Officer and Breach of Peace on June 3, 2011. [Dkt. # 159, Ex. 1, Pl. Edward Nelson's Rule 56(a)(2) Stmt., ¶20].

Mrs. Nelson also disputes the Defendants version of the facts, arguing that "if the alleged assault was supposed to transpire with me, and then they made up all these other stories after that, I wasn't even anywhere near the scene." [Dkt. #160, Ex. 31, Deposition of Patricia Nelson, 13:23-14:1].  Rather, Mrs. Nelson asserts that she was "way down the street. I had no knowledge of what was going on with my husband up the street." [*Id.* at 14:2-4].  Mrs. Nelson denies approaching the area where Defendant Dogali was arresting her husband and claims that she "never left my vehicle." [*Id.* at 33:9-11].  Mrs. Nelson claims that she did not see the Officers struggling with Mr. Nelson or Taser Mr. Nelson. [*Id.* at 33:12-17].

 Mrs. Nelson asserts that she was assaulted by Defendant Connelly, her arresting officer. [Dkt. #160, Ex. 31, Deposition of Patricia Nelson, 14:9-10].  Specifically, Mrs. Nelson asserts that Defendant Connelly kneed her in the back of her left leg, grabbed her by her hair and pushed her head down with such force that her wig came off and she felt her head bleeding. [*Id.* at 18:6-7, 18:18-22, 60:4-14].

Although Defendant Sergeant Connelly admits pushing Mrs. Nelson against a parked vehicle in order to place her in handcuffs, he denies pushing her head into the vehicle and causing a laceration to her face. [Dkt. #160, Ex. 27, Defendant Connelly Stamford Police Incident Report]; [Dkt. #160, Ex. 24, 19:10-

15].  Defendant Sergeant Connelly's Incident Report following Mrs. Nelson's arrest indicates that she had "No Apparent Physical Injury" at the time of her arrest. [Dkt. #160, Ex. 27].

Instead, the Defendants assert that Mrs. Nelson hit her head on the bed in the Stamford Police Department in female cell #2 where she was placed after her arrested and searched while in police custody. [Dkt. # 159, Ex. 60, Defendant Fitzgibbons Stamford Police Incident Report].  A video exhibit submitted by both the Plaintiffs and the Defendants shows Mrs. Nelson in a cell with three officers during a search of her clothing. [Dkt. #159, Ex. KKK]; [Dkt.#145, Ex.11].  The video shows Mrs. Nelson's hostile and intoxicated demeanor. She is seen screaming loudly at the officers and moving her body erratically. As the two male officers hold Mrs. Nelson's arms and place her in a seated position on the metal bed in the cell, Mrs. Nelson appears to lean to her right, banging her head against the cell bars and then on the metal bed. [*Id.*]. Mrs. Nelson admits that the bed in the jail cell is made of hard metal. [Dkt. #160, Ex. 1, Pl. Patricia Nelson's Rule 56(a)(2) Stmt., ¶20].  A few moments later, the video shows Mrs. Nelson touching her head with her hand and Mrs. Nelson cries out that she is bleeding. Mrs. Nelson then questions why she is bleeding. [*Id.*].

Mrs. Nelson asserts that while in the cell, she was subjected to an illegal strip search directed by Defendant Sergeant Fitzgibbons with the assistance of Officer Sandra Connetta and Officer James Herbert during which her clothing was removed and her breasts were exposed to view. [Dkt. #160, Ex. 56, Affidavit of Patricia Nelson, ¶9].  Mrs. Nelson alleges that Defendant Sergeant Fitzgibbons

"had his hands inside the side of my pants touching my buttocks for no other reason than to humiliate me." [*Id.* at ¶10].

After Mrs. Nelson received the laceration to her head, the Defendants contacted EMS to have Mrs. Nelson taken to the hospital for treatment. Mrs. Nelson received treatment for a "0.5cm [0.19in] laceration just to the lateral aspect of her right eye" and was discharged. [Dkt. #159, Ex. 60, Defendant Sergeant Fitzgibbons Stamford Police Incident Report]; [Dkt. #160, Ex. 44, Stamford EMS Report]; [Dkt. #160, Ex. 46, Stamford Hospital Medical Record for Patricia Nelson].

Mr. Nelson also alleges that he was subjected to an illegal strip search and a second incident of excessive force during the booking process. Mr. Nelson asserts that while in the booking area, he was approached from behind by Defendant Sergeant Fitzgibbbons, who slammed Mr. Nelson to the floor for no reason. [Dkt. #160, Ex. 16, Affidavit of Edward Nelson, ¶6]. Mr. Nelson then asserts that Defendant Sergeant Fitzgibbons lifted him to his feet with leg irons on his feet and handcuffs on his wrists, and then "sadistically raised [his] arms behind [his] back to inflict pain." [*Id.* at ¶7]. Mr. Nelson further alleges that as his back was bent downward as a response to his arms being raised behind his back, his penis was exposed to the officers in the booking area, causing a humiliating experience. [*Id.*, at ¶9].

The Defendants contend that the searches of both Mr. and Mrs. Nelson were conducted, consistent with Stamford Police Department Policy, to search for any item that could be used as a weapon or anything that Mr. and Mrs. Nelson

could have used to injure themselves while in custody, including shoelaces, belts, extra clothing, brassieres, and sharp jewelry. [Dkt. #160, Ex. 28, Deposition of Sergeant Fitzgibbons, 37:14-20].

Twenty days later, on November 12, 2006, Mr. and Mrs. Nelson submitted written complaints to the Internal Affairs Department of the Stamford Police Department. [Dkt. #159, Ex.1, Pl. Edward Nelson's Rule 56(a)(2) Stmt., ¶38]; [Dkt. #160, Ex. 1, Pl. Patricia Nelson's Rule 56(a)(2) Stmt, ¶34].

## II.     Standard of Review

"The standards governing summary judgment are well settled." *Ford v. Reynolds*, 316 F.3d 351, 354, 379 (2d Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford*, 316 F.3d at 354. "[T]he burden on the moving party may be discharged by 'showing' - that is point out to the district court - that there is an absence of evidence to support the nonmoving party's case." *PepsiCo. Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the

absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

The Court must "construe the evidence in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted).

III.   Discussion

A.  Excessive Force

Both Plaintiffs assert in their complaint that the arresting officers used excessive force to affect their arrest, and Mr. Nelson asserts a second claim of excessive force used during the booking process.

Claims arising from the use of force during an arrest are analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Applying this standard, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."

*Id.* at 396 (citation and internal quotation marks omitted).  Such analysis requires the court to examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted). Further, reasonableness must be judged objectively under the circumstances, "from the perspective of a reasonable officer on the scene," and allow for the fact "that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

### 1.  Mr. Nelson's Claims of Excessive Force

Mr. Nelson admits that he passively resisted Defendant Dogali's attempts to place him in handcuffs, but alleges that he was subjected to excessive force at the time of his arrest when Defendant Sergeant Scanlon applied a Taser to him. [Dkt. #159, Ex. 22, Deposition of Edward Nelson, 20:4-8].  Mr. Nelson asserts that when one Taser prong hit his finger and the other prong did not connect, consistent with Mr. Nelson's admission that he passively resisted arrest, Defendant Sergeant Scanlon had to press it against his leg. [Dkt. #160, Ex. 33, Deposition of Edward Nelson, 11:1-6].

Consistent with Mr. Nelson's admission that he passively resisted arrest, Defendant Dogali reports that Mr. Nelson refused to place his hands behind his back despite several instructions to do so. [Dkt. #160, Ex.29, Def. Dogali Stamford Police Dept. Incident Report].  Defendant Dogali further reports that Mr. Nelson

was heavier and more powerful and that with only one of Mr. Nelson's hands placed in handcuffs, he felt that Mr. Nelson presented a dangerous situation. [Dkt. #144, Ex. 5, Affidavit of Defendant Dogali, ¶¶5, 9].  Defendant Sergeant Scanlon reports that when he arrived on the scene he observed Mr. Nelson screaming and struggling with Defendant Dogali. [Dkt. #159, Ex. 34, Def. Scanlon Stamford Police Dept. Incident Report].  Defendant Scanlon stated in his Incident Report that he advised Mr. Nelson that if he did not comply with the Officers' instructions a Taser would be used. [*Id.*].  Defendant Scanlon further reports that he repeated the warning a second time and after Mr. Nelson again refused to comply, Defendant Scanlon applied the Taser to Mr. Nelson's left leg, enabling Defendants Dogali and Scanlon to handcuff Mr. Nelson. [*Id.*].  Mr. Nelson claims that he was not warned before the Taser was used. [Dkt. #159, Ex.22, Deposition of Edward Nelson, 20:4-8]; [Dkt. #160, Ex. 33, Deposition of Edward Nelson, 11:1-6].

Viewing the facts in the light most favorable to the Plaintiffs, the non-moving party, as the Court is required to do in evaluating a motion for summary judgment, the Court finds that there are genuine issues of material fact in dispute regarding the force applied to Mr. Nelson at the time of his arrest.  Whereas Mr. Nelson alleges that he was merely passively resisting arrest when a Taser was applied to his body, the Defendants report that Mr. Nelson was actively struggling to avoid being placed in handcuffs and ignored repeated instructions to place his arms behind his back in order to avoid being subjected to a Taser.  Therefore, an obvious material factual dispute exists as to whether Defendants Dogali and Scanlon applied force in excess of an amount that was objectively reasonable in

effectuating Mr. Nelson's arrest. Applying the "objectively reasonable" standard as articulated in *Graham* and viewing the facts in the light most favorable to the Plaintiff, the non-moving party, a reasonable juror could find that the Defendants' conduct constituted excessive force in violation of the Fourth Amendment and therefore Defendants' motion for summary judgment with respect to Plaintiff Edward Nelson's claim of excessive force during his arrest is denied as to Defendants Dogali and Scanlon.

Defendants' motion for summary judgment as to Plaintiff's claim of excessive force during his arrest as to the other named Defendants is granted due to the Plaintiff's failure to establish that any of the other named Defendants used force to arrest him. *See Dunn v. Carrier*, 137 Fed. Appx.387 (2d Cir. 2005) (holding that investigators were not liable for excessive force absent a showing of personal involvement in the alleged assault); *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983'") (citation omitted).

Construing the oblique pro se complaint liberally, Mr. Nelson appears to raise a second claim of excessive force related to the booking process at the Stamford Police Department. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (holding that District Courts must liberally construe complaints filed by *pro se* plaintiffs and interpret them "to raise the strongest arguments that they suggest"). Mr. Nelson alleges that while in the booking area, he was approached from behind by Defendant Sergeant Fitzgibbons, who slammed him to the floor

for no reason. [Dkt. #160, Ex. 16, Affidavit of Edward Nelson, ¶6]. Mr. Nelson then claims that Defendant Sergeant Fitzgibbons lifted him to his feet with leg irons on his feet and handcuffs on his wrists and "sadistically raised [his] arms behind [his] back to inflict pain." [*Id.* at ¶7].

The Defendants submitted a video of the booking room during Mr. Nelson's booking process. [Dkt. #144, Ex. 12]. The video shows Edward Nelson being questioned, and removing his shoes, belt, and shirt. [*Id.*].  The video then shows an Officer taking hold of Mr. Nelson's arm and being placed face down onto the floor. It is unclear from the poor quality of the video how much force was applied to Mr. Nelson in order to guide him to the floor. Therefore, a material factual dispute exists regarding the amount and reasonability of the force applied to Mr. Nelson to guide him to the floor during a search of his clothes in the booking room. As a reasonable juror could conceivably find that excessive force was applied to Mr. Nelson to bring him to the floor, the Defendants' motion for summary judgment as to Mr. Nelson's claim of excessive force against Defendant Sergeant Fitzgibbons is denied. Defendants' motion for summary judgment as to the other named Defendants is granted due to the Plaintiff's failure to establish any personal involvement of any other named Defendant in the acts which form the basis of this claim of excessive force. *See Dunn*, 137 Fed. Appx.387.

2.  Mrs. Nelson's Claim of Excessive Force

Mrs. Nelson alleges a single claim of excessive force in the operative complaint [Dkt. #116, Third Amended Complaint]. Specifically, Mrs. Nelson asserts that, Defendant Sergeant Connelly, in attempting to affect her arrest,

kneed her in the back of her left leg, grabbed her by her hair and pushed her head down with such force that her wig came off and she felt her head bleeding. [Dkt. #159, Ex. 9, Deposition of Patricia Nelson, 18:6-22, 60:4-14].  Defendant Sergeant Connelly admits that he pushed her into a vehicle, but denies shoving her head into a car and causing her head to bleed. [Dkt. #160, Ex. 27, Defendant Sergeant Connelly Stamford Police Incident Report]; [Dkt. #160, Ex. 24, Deposition of Sergeant Michael Connelly, 19:10-15].

The Defendants assert that Mrs. Nelson received a cut over her right eye after she hit her head on the bed in a cell at the Stamford Police Department while she was combative and intoxicated.  [Dkt. #159, Ex. 60, Defendant Sergeant Fitzgibbon's Stamford Police Department Incident Report].  Defendant Sergeant Connelly's Incident Report following Mrs. Nelson's arrest indicates that Mrs. Nelson had "No Apparent Physical Injury." [Dkt. #160, Ex. 27, Defendant Sergeant Connelly Stamford Police Incident Report].

A video surveillance camera recorded Mrs. Nelson in a single female cell at the Stamford Police Department. The video, submitted as an exhibit by both Plaintiffs and Defendants, shows Mrs. Nelson in a cell with three officers during a search of her clothing. [Dkt. #145, Ex. 11]. The video shows two male officers hold Mrs. Nelson's arms and place her in a seated position on the metal bell in the cell. [*Id.*]. Mrs. Nelson then leans to the right and falls, causing an impact to her head against the cell bars to her right, and then the metal bed. [*Id.*].  Mrs. Nelson then cries out, "I'm bleeding, I'm bleeding, why the fuck am I bleeding?" However, Mrs. Nelson contends that the injury to her head was inflicted earlier, when Defendant

Connelly pushed her face into a vehicle during her arrest, prior to her arrival at the Stamford Police Department. [Dkt. #159, Ex.9, Deposition of Patricia Nelson, 18:11-22].

Viewing the facts in the light most favorable to Plaintiffs, the non-moving party, the Court finds that there are genuine issues of material fact in dispute regarding Mrs. Nelson's claim of excessive force.  Mrs. Nelson alleges that she sustained an injury to her head when it was thrust onto a vehicle during her arrest.  Defendant Sergeant Connelly admits that he pushed her into a vehicle, but denies shoving her head into a car and causing her head to bleed. [Dkt. #160, Ex. 27, Defendant Sergeant Connelly Stamford Police Incident Report]; [Dkt. #160, Ex. 24, Deposition of Sergeant Michael Connelly, 19:10-15].  Rather, the Defendants contend that Mrs. Nelson sustained the injury to her head when she hit her head on the bed in female #2 as a result of her combative and intoxicated behavior. [Dkt. #159, Ex. 60, Sergeant Fitzgibbons Stamford Police Department Incident Report].  The Defendant's claim is consistent with a videotape of Mrs. Nelson's cell at the Stamford Police Department, submitted as evidence by both parties, which shows Mrs. Nelson's body falling down and striking the cell bars and then the cell bed, after which she screams that she is bleeding. [Dkt. #145, Ex. 11]; [Dkt. #160, Ex. KKK].

There is a material factual dispute as to the amount of force applied to Mrs. Nelson during the time of her arrest and whether that force caused Mrs. Nelson to sustain a laceration to her head, such that a reasonable juror could find that Defendant Sergeant Connelly applied excessive force to Mrs. Nelson in violation

of the Fourth Amendment.  This disputed issue exists despite the video impeachment of Mrs. Nelson's credibility and medical records evincing her extreme intoxication. Accordingly, Defendants motion for summary judgment as to Plaintiff Patricia Nelson's claim of excessive force is denied. Once again, Defendants' motion for summary judgment as to the other named Defendants is granted due to Plaintiff's failure to establish that any of the other named Defendants were personally involved in the conduct which formed the basis of Mrs. Nelson's claim of excessive force. *See Dunn*, 137 Fed. Appx.387.

### 3.  Qualified Immunity

Defendants argue that Defendants Scanlon and Connelly are entitled to qualified immunity for their applications of force to Mr. and Mrs. Nelson pursuant to their arrests. Although the Defendants did not discuss the issue of qualified immunity regarding Defendant Sergeant Fitzgibbons, the Court assumes that the Defendants' would have argued in favor of the application of qualified immunity towards Defendant Sergeant Fitzgibbons as well.

Qualified immunity protects a "government official acting in an official capacity from suit for damages under § 1983 unless the official violated clearly established rights of which an objectively reasonable official would have known." *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 358 (2d Cir. 2004); see also *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated that first, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right, and then second, the court must decide whether the right at issue was "clearly

established" at the time of the defendant's alleged misconduct. *Id.* at 201. Subsequently, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court ruled that courts are permitted to exercise their discretion in determining which of the two prongs should be addressed first.

Here, the right to be free from the use of excessive force under the Fourth Amendment has long been clearly established. *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000); *Carey v. Maloney*, 480 F. Supp. 2d 548, 556 (D.Conn. 2007). However, Defendants Connelly, Sergeant Scanlon and Sergeant Fitzgibbons would be entitled to qualified immunity if they made a reasonable mistake about the amount of force required. As noted above, there are genuine issues of material fact in dispute in all three alleged instances of excessive force that directly bear on the Court's analysis regarding the reasonableness of the Defendants use of force. Where, as here, facts material to the qualified immunity analysis are in dispute, summary judgment is not appropriate. *Warren v. Williams*, No. Civ.A. 304CV537 (JCH), 2006 WL 860998, at *33 (D.Conn. March 31, 2006) (finding that "[w]hile the defendants are entitled to qualified immunity if they made a reasonable mistake about the amount of force required by the situation, given the degree to which factual disputes exist regarding the type and amount of force used, as well as the circumstances surrounding the use of force, the court cannot conclude, on summary judgment, that the defendants are entitled to qualified immunity."); *see also Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("summary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain"); *Thomas v. Roach*, 165

F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity is not appropriate when there are facts in dispute that are material to a determination of reasonableness."). The Court is therefore unable to conclude on summary judgment that Defendants Connelly, Sergeant Scanlon and Sergeant Fitzgibbons are entitled to qualified immunity.

### B.  Connecticut Common Law Assault & Battery

Along with their claims of excessive force, Plaintiffs have raised claims of assault and battery under Connecticut common law. The Defendants argue that in order to prevail on their claims of assault and battery, Plaintiffs must show that the Defendant Officers applied force, the application of which was unlawful.  The Defendants further argue that a claim of excessive force is "tightly interwoven" with a state claim for assault and battery, and therefore, where the Court finds that the excessive force claim should fail, the assault claim should also fail.

Given the Court's aforementioned conclusion that genuine and material factual disputes remain regarding the amount and reasonability of force applied to Mrs. Nelson during her arrest, to Mr. Nelson during his arrest, and to Mr. Nelson during the booking process, the Defendants' motion for summary judgment is denied as to the claims of assault and battery. *See Ochoa v. City of West Haven*, No. 3:08cv00024 (DJS), 2011 WL 3267705 (D.Conn. July 29, 2011)(declining to grant summary judgment on plaintiff's assault and battery claims on the basis of unresolved issues of fact on plaintiff's excessive force claim); *see also Owens v. Hussey*, No. 3:09cv1768 (WWE), 2011 WL 2173709 (D.Conn. June 2, 2011) (denying summary judgment on plaintiff's assault and

battery claim where disputed issues of fact remained such that the Court could not determine whether the use of force was justified).

### C.  False Arrest, False Imprisonment, and Malicious Prosecution

Plaintiffs raise claims of false arrest pursuant to 42 U.S.C. §1983, false imprisonment under Connecticut law, and malicious prosecution. Given that each Plaintiff was charged with criminal offenses incident to their arrest, the Court will analyze these claims as to each Plaintiff separately.

#### i.  Mr. Nelson

In the Second Circuit, courts analyzing claims of false arrest "have generally looked to the law of the state in which the arrest occurred." *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004).  This approach is consistent with the standard practice of looking to state and common law principles to determine the law applicable to §1983 claims. *See id.* at 434, n. 7. Under Connecticut law, a plaintiff bringing a claim of false arrest bears the burden of proving an unlawful arrest. *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007).  A claim for false arrest "cannot lie when the challenged arrest was supported by probable cause." *See id.* (citing *Beinhorn v. Saraceno*, 23 Conn.App. 487, 491, 582 A.2d 208, 210 (1990). A showing of probable cause for an arrest is also a complete defense to claims of false imprisonment. *See Smith v. Lanati*, 271 Fed, Appx. 65,66 (2d Cir. 2008).   A conviction, "unless it has been reversed- is 'conclusive evidence' that there existed probable cause for the defendant's arrest, *Lewis v. Bornstein*, No. 3:09cv666 (MRK), 2011 WL 336852, at *3 (D.Conn. Jan. 28, 2011) (citing *Weyant v. Okst.*, 101 F.3d 845, 852 (2d Cir. 1996).  Therefore, a conviction,

which provides "conclusive evidence" that probable cause existed, bars claims of both false arrest and false imprisonment.

Further, under Connecticut law, a plaintiff seeking to establish a claim of malicious prosecution must allege that the prosecution terminated in his or her favor. *See Kern v. Heimerdinger*, No. 3:09cv1000(PCD), 2010 WL 5069883, at \*2 (D.Conn. Dec. 6, 2010) (citing *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992)). A conviction, the opposite of a favorable termination, is a defense to a claim of malicious prosecution. *See Lagasse v. City of Waterbury*, No. 3:09cv391 (VLB), 2011 WL 2709749, at \*5 (D.Conn. July 12, 2011) (citing *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992)

On June 3, 2011, Mr. Nelson was found guilty of interfering with an officer and breach of peace. [Dkt. #141, Ex. 9, State of Connecticut v.  Edward Nelson Judgment].  Mr. Nelson alleges, however, that despite his conviction, he can establish a claim of false arrest because the State of Connecticut did not pursue the charge of Assault in the Third Degree on the basis of Mrs. Nelson's statements that she was not assaulted by Mr. Nelson. Mr. Nelson further alleges that the Defendants lacked probable cause for his arrest.  However, the Defendants were not required to have probable cause for every charge for which Mr. Nelson was arrested; probable cause for *any crime* is a defense to false arrest. *See Pacicca v. Stead*, No. 10-1069, 2011 WL 5515954, at \*1, n. 1 (2d Cir. Nov. 14, 2011) (emphasis added) (citing *Brown v. Kelly*, 609 F.3d 467 (2d Cir. 2010).  It is indisputable that probable cause existed for Mr. Nelson's arrest, given his conviction. *See Lewis*, 2011 WL 336852, at \*3 (holding that a conviction,

"unless it has been reversed- is 'conclusive evidence' that there existed probable cause for the defendant's arrest").

Mr. Nelson further argues that he can establish a claim of malicious prosecution because the State of Connecticut elected not to pursue the charges of Assault in the Third Degree and Breach of Peace in the Second Degree. Despite his explicitly fallacious assertion to the contrary, Mr. Nelson was convicted after trial of Breach of Peace in the Second Degree. [Dkt. #141, Ex. 9, State of Connecticut v. Edward Nelson Judgment]. Therefore he cannot establish a claim of malicious prosecution as to the charge of Breach of Peace in the Second Degree, as he did not receive a favorable termination of the charge. *See Lagasse*, 2011 WL 2709749 at *5. Furthermore, Mr. Nelson's claim for malicious prosecution as to the Assault charge must necessarily fail because probable cause existed for Mr. Nelson's arrest based on the aforementioned reasoning, and "probable cause is fatal to claims of both false arrest and malicious prosecution." *See Simonetti v. City of Bridgeport*, No. 3:04cv1732, 2006 WL 3098764, at *4 (D. Conn. Oct. 31, 2006).

Accordingly, Mr. Nelson cannot sustain claims of false arrest, false imprisonment, or malicious prosecution against the Defendants. Defendants' motion for summary judgment is granted as to these claims.

   ii. Mrs. Nelson

Mrs. Nelson alleges that she was subject to both false arrest and malicious prosecution. [Dkt. #116, Amended Compl., ¶173].   As noted above, favorable termination is a necessary element of both false arrest and malicious

prosecution. *See Miles v. City of Hartford*, No. 10-3375-cv, 2011 WL 5041695, at *2-3 (2d Cir. Oct. 25, 2011).

Mrs. Nelson cannot establish a favorable termination because her criminal case is still pending more than five years after her arrest. [Dkt. #144, Ex. 10, Pending Case Detail, Docket No. S01S-CR06-0157427-S].  As of January 6, 2012, Mrs. Nelson's next court date is scheduled for 11/11/2019 at 10:00AM.  See State of Connecticut Judicial Branch, Pending Case Detail, Docket No. S01S-CR06-0157427-S, available at

http://www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending&Key=a577daba-8ed7-4732-9d73-a524260cd1e5.

Mrs. Nelson argues that the State of Connecticut has failed to prosecute her within the statute of limitations applicable to her misdemeanor charges. The Court finds this argument wholly unpersuasive. Although Mrs. Nelson's case has been pending for several years, the statute of limitations merely requires the filing of a claim within the applicable time period, not the disposition of the case within the applicable time period.  Moreover, she has not asserted that she sought dismissal of the charges for failure to prosecute.

Accordingly, the Court finds that Mrs. Nelson cannot establish that her criminal case has reached a favorable termination and therefore she cannot establish a claim of either malicious prosecution or false arrest. The Court grants Defendants motion for summary judgment as to Mrs. Nelson's claims of malicious prosecution and false arrest.

### D.  Connecticut Constitutional Claims

Without pointing to any specific factual allegations, in Counts Five and Six of their Third Amended Complaint, Plaintiffs assert that the Defendants have violated their rights under Article I, Sections 7 and 9 of the Connecticut Constitution. [Dkt. #116, Third Amended Complaint, ¶¶182-185].

Defendants argue that courts have been reluctant to create private causes of action for money damages under the Connecticut Constitution, and rely on *Kelley Property Development, Inc. v. Lebanon*, 226 Conn. 314, 627 S.2d 909 (1993) for the proposition that as the Plaintiffs have adequate alternative remedies through 42 U.S.C. §1983, the Plaintiffs claims under Article I, Sections 7 and 9 should be dismissed.

The Court is unpersuaded by this argument. In *Binette v. Sabo*, 244 Conn. 23, 710 A.2d 688 (1998) the Connecticut Supreme Court distinguished its prior decision in *Kelley Property Development*, and, analogizing to the United States Supreme Court's analysis in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403, U.S. 388 (1971), explicitly recognized a private cause of action for damages under Article I, §§7 and 9 of the Connecticut Constitution. *Binette*, 244 Conn. 23; *see also Yorzinski v. Alves*, 477 F.Supp.2d 461 (D.Conn. 2007) (denying summary judgment as to plaintiff's claim for a violation of Connecticut Constitution Art.I §7 in reliance on the Connecticut Supreme Court's decision in *Binette*); *see also Gillespie v. Ancona*, 1999 WL 66538, at *3 (D.Conn. Feb. 4, 1999) (recognizing the Connecticut Supreme Court's recent creation in *Binette* of a common law right of action for damages in cases involving unlawful arrests, and unreasonable searches and seizures by government officials).

In *Binette*, the plaintifs, Joseph and Janet Binette, brought suit against a police chief and police officer, alleging that the police chief threatened Mrs. Binette with arrest and pushed her, causing her to fall over a table and against a wall. The plaintiffs further alleged that the police officer repeatedly slammed Mr. Binette's head against a car, and then struck Mr. Binette in the head and kicked him while he was lying on the ground experiencing an epileptic seizure. *See Binette*, 244 Conn. at 26, 710 A.2d 688. The Connecticut Supreme Court ultimately allowed a claim for violations of Article I, §§7 and 9 of the Connecticut Constitution in light of the egregious circumstances of the case, but emphasized that such a remedy is not available in all cases alleging violations of the state constitution. *Id.* at 47-50, 710 A.2d 688.

Following *Binette*, Connecticut courts have significantly curtailed private rights of action under Article I, §§7 and 9, limiting the availability of a private cause of action to circumstances involving egregious violations. *See Bauer v. City of Hartford*, No. 3:07-cv-1375 (PCD), 2010 WL 4429697 (D.Conn. Oct. 29, 2010). For example, in *Martin v. Brady*, 64 Conn. App. 433, 780 A.2d 961 (Conn. App. 2001), the court found that the plaintiff's allegations of state officers entering his home without a valid search warrant, pushing him to the ground, and smashing the windows and doors of his house, did not rise to the level of egregious conduct necessary to maintain an action under *Binette*. Similarly, another court in this District declined to recognize a private cause under Art. I, §9 on the grounds that the circumstances did not rise to the level of egregious, where the plaintiff was struck with a baton until he fell to the ground and could be

handcuffed. *Faulks v. City of Hartford*, No. 08-cv-270(VLB), 2010 WL 259076, at *9-10 (D.Conn. Jan. 19, 2010).

Here, the Court finds that the Plaintiffs' factual allegations do not constitute egregious conduct recognized in *Binette* as warranting a private right of action under the Connecticut Constitution. Much like the plaintiff in *Faulks*, Mr. Nelson admits that he was passively resisting being placed in handcuffs and was subjected to a Taser in order to permit his proper restraint. Further, Mrs. Nelson, who alleges that Defendant Connelly kneed her in the back of the leg and pushed her head onto the hood of a vehicle, resulting at worse in a laceration less than two tenths of an inch long not so much as requiring a single stitch, was not subjected to the type of unnecessary violence experienced by Mr. Binette, who was repeatedly slammed into a car and struck in the head while experiencing an epileptic seizure.

Accordingly, summary judgment is granted in favor of the Defendants on Plaintiffs' claims under Article I, §§7 and 9 of the Connecticut Constitution.

### E.  Claims Raised under the Fifth and Fourteenth Amendments

Plaintiffs' Second, Eighteenth and Twenty-First causes of action all allege claims under the Fourteenth Amendment. Plaintiffs' Fourth cause of action alleges a violation of the Fifth Amendment.  The Defendants assert that the Plaintiffs cannot maintain these claims as the Fourth Amendment provides an explicit source of constitutional protection for the type of conduct at issue, thereby preventing the Plaintiffs from relying on general due process protection.

The Court notes at the outset that the Plaintiffs appear to have abandoned these claims by entirely failing to defend them. Mrs. Nelson's memorandum in opposition to summary judgment references the Fourteenth Amendment claims in only one instance, in a sub-heading that seemingly abandons the claims by stating that "the Second, Eighteenth, and Twenty-First Causes of Action Should be Dismissed For Failure to State a Claim." [Dkt. #160, Patricia Nelson's Mem. in Opp. to Summary Judgment, p. 33].  Mrs. Nelson's memorandum addresses the Fifth Amendment claim in a single sub-heading stating that "The Fourth Cause of Action Should Not Be Dismissed For Failure to State A Claim." [*Id.*].  Similarly, Mr. Nelson's Memorandum in Opposition to Summary Judgment references the claims in two sub-headings, followed by absolutely no legal argument whatsoever. [Dkt. #159, Edward Nelon's Mem. in Opp. to Summary Judgment, p. 36]. Accordingly, the Court finds that the Plaintiffs have abandoned the Second, Fourth, Eighteenth and Twenty-First causes of action. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (*citing Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases)); *see also*, *Spencer v. Ellsworth*, No. 09civ.3773, 2011 WL 1775963, at *7 (S.D.N.Y. May 10,2011) (finding that Plaintiff had abandoned certain claims as he "has not substantiated any of these claims and did not attempt to substantiate them in response to the motion for summary judgment."); *Schlenger v. Fidelity Employer Servs. Co.*, LLC, Np.09-cv-3986, 2011 WL 1236156, at *23

(S.D.N.Y. March 31, 2011) ("Plaintiff did not address Count Four in her Opposition to MetLife's Motion for Summary Judgment, and on this basis alone, those claims are deemed abandoned and summary judgment could be granted in MetLife's favor"). The Court's conclusion is buttressed by the fact that these claims lack merit.

Assuming, *arguendo*, that Plaintiffs had not abandoned these claims, the claims would necessarily fail. As the Defendants correctly noted, the Plaintiffs claims of "excessive force pursuant to the Fourth Amendment [. . .] preclude a claim for a violation of substantive due process under the Fourteenth Amendment." *See Clark v. Dowty*, No. 3:05-cv-1345 (WWE), 2007 WL 2022045, at *7(D.Conn. July 9, 2007)(citing *Albright v. Oliver*, 510. U.S. 266, 273-74 (1994)); *see also Woodmansee v. Mickens*, No. 04-cv-1896 (WWE), 2006 WL 752893, at *4 (D.Conn. March 22, 2006) (granting summary judgment to plaintiff's due process claims under the Fifth and Fourteenth Amendments on the basis of plaintiff's claims under the First and Fourth Amendments).

Accordingly, the Court grants summary judgment as to the Plaintiffs' Second, Fourth, Eighteenth, and Twenty-First causes of action.

### F.  Monell Claims

Plaintiffs Mr. and Mrs. Nelson have each raised claims against the City of Stamford alleging that a policy, practice or custom existed to make it difficult for citizens to file internal affairs complaints with the Stamford Police Department on the basis of excessive force. As a result of this policy, practice or custom, Plaintiffs further contend that the Stamford Police Department officers "became

more brazen in utilizing excessive force against citizens, knowing that the Stamford Police Department would protect wayward officers by discouraging citizens from filing Internal Affairs Complaints against them." [Dkt. #159, Pl. Edward Nelson Mem. in Opposition to SJ, p.35]. In support of this claim of municipal liability, the Plaintiffs offer several news articles referencing concerns regarding the complaints process of the Stamford Police Department. Plaintiffs also allege a theory of municipal liability on the basis of a failure to train, alleging that Defendant Chief Brent Larrabee and Defendant Lieutenant Thomas Cronin failed to properly supervise and train his subordinates regarding internal investigations.

The Defendants challenge the Plaintiffs claims against the City of Stamford, arguing that the Plaintiffs have failed to assert facts to substantiate the existence of a custom, and that even if facts demonstrating a custom had been presented, the Plaintiffs cannot show that such a custom caused the deprivation of their constitutional rights. Specifically, the Defendants argue that Plaintiffs have not presented evidence to show that a custom of discouraging internal affairs complaints caused the individual defendants in this lawsuit to use excessive force, make a false arrest, engage in a conspiracy, or commit any of the other violations alleged in the complaint. Further, Defendants argue that Plaintiffs have not presented facts sufficient to support a "failure to train" theory of liability because they have not presented facts to demonstrate that either Defendant Chief Larrabee or Defendant Lieutenant Cronin were informed of unconstitutional conduct by officers and acted with deliberate indifference, nor have the Plaintiffs

presented evidence of any training program related to internal investigations or any deficiency therein.

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A municipality may be "held liable if a plaintiff proves the municipality violated a federally protected right through (1) municipal policy, (2) municipal custom or practice, or (3) the decision of a municipal policymaker with final policymaking authority." *Zherka v. DiFiore*, 412 Fed.Appx. 345, 348 (2d Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658. 695 (1978)).

A plaintiff may "establish municipal liability by showing that a municipal policy or custom existed as a result of the municipality's deliberate indifference to the violation of constitutional rights, either by inadequate training or supervision." *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 107 (D. Conn. 2004). "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *City of Canton v. Harris*, 489 U.S. 378, 396 (1989). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates,

such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under §1983." *Amnesty Am. v. Town of W. Hartford*, 361 F. 3d 113, 126 (2d Cir. 2004) (internal quotation marks omitted).

A claim for failure to train "will trigger municipal liability only where the failure to train amounts to the deliberate indifference to the rights of those with whom the state officials will come into contact." *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998) (internal quotation marks and citation omitted). The Second Circuit has outlined "three showings required to support a claim that a municipality's failure to train amounted to 'deliberate indifference' to the rights of citizens." *Id.* at 903-904. Therefore to establish a claim of inadequate training, Plaintiffs mush show that (1) "a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation"; (2) that the "situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) that "the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (citations omitted).

Therefore a municipality "cannot be liable if the need for such training was not obvious." *Russo v. City of Hartford*, 341 F. Supp. 2d at 109 (citing *Vann*, 72 F.3d at 1049). In addition, "a pattern of misconduct, while perhaps suggestive of inadequate training, is not enough to create a triable issue of fact on a failure-to-train theory. The plaintiff must offer evidence to support the conclusion that the

training program was inadequate, not [t]hat a particular officer may be unsatisfactorily trained or that an otherwise sound program has occasionally been negligently administered, and that a hypothetically well-trained officer would have avoided the constitutional violation." *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 440-41 (2d Cir. 2009) (internal quotation marks and citations omitted).

Plaintiffs' only evidence presented in support of their *Monell* claims consist of affidavits of individuals who had difficulty filing internal affairs complaints with the Stamford Police Department and news articles referencing concerns with the complaint process at the Stamford Police Department. The Court finds that this evidence has wholly failed to demonstrate the existence of a policy, practice, or custom that could have caused the Plaintiffs' to suffer the deprivation of a constitutional right, given that the affidavits and news articles all post-date the Plaintiffs' successful endeavor to file an internal affairs complaint.

For example, the Affidavit of Arlene Garcia describes her encounter with a Stamford Police Officer in June of 2007 and her attempt to file a complaint following that interaction. [Dkt. #160, Ex. 37, Affidavit of Arlene Garcia].  Similarly, the Affidavit of Shanitha Simpson relates to her arrest on October 31, 2006 and her attempt thereafter to file an internal affairs complaint. [Dkt. #160, Ex. 39, Affidavit of Shanitha Simpson]. The news articles, dated September 1, 2009, September 19, 2009, and January 22, 2010, are similarly incapable of demonstrating a policy, custom or practice in existence prior to the Plaintiffs' arrest and attempt to file an internal affairs complaint which could have caused

the Plaintiffs' alleged incidents of excessive force. [Dkt. #160, Ex. 45, Westport News Article dated 9/1/09]; [Dkt. #160, Ex. 147, MSNBC Article dated 2/19/09]; [Dkt. #160, Ex. 49, Connecticut Post Online Article dated 1/22/10]. *See Roe*, 542 F.3d at 36 (requiring proof that an official policy of the municipality caused the constitutional injury in order to sustain a claim of municipal liability).  Moroever, such news articles are inadmissible in the context of *Monell* claims when offered to prove the truth of the contents. *See Delrosario v. City of New York*, No. 07-cv-2027(RJS), 2010 WL 882990, at *7 (S.D.N.Y. March 4. 2010) (noting that a New York Times article submitted by the Plaintiff as evidence in opposition to summary judgment in the context of a *Monell* claim was inadmissible when offered to prove the truth of the matter asserted).  Lastly, the Court notes that, contrary to the Plaintiffs' assertion that a policy, practice or custom existed to discourage the filing of internal affairs complaints, the Plaintiffs successfully filed an internal affairs complaint on November 19, 2006, just a few weeks after their arrest on October 22, 2006. [Dkt. #160, Ex. 1, Pl. Patricia Nelson's Rule 56(a)(2) Stmt. in Opposition to Defs. Motion for Summary Judgment, ¶34]. Moreover, the Plaintiffs allege that the Stamford Police Department impeded their efforts to file an internal affairs complaint when in fact the record shows that they filed their complaint on November 12, 2006, shortly after their arrest on October 22, 2006. [Dkt. #159, Ex.1, Pl. Edward Nelson's Rule 56(a)(2) Stmt., ¶38]; [Dkt. #160, Ex. 1, Pl. Patricia Nelson's Rule 56(a)(2)Stmt., ¶34].

The Plaintiffs' evidence in support of their failure to train theory of liability is even sparser. The sole evidence presented by the Plaintiffs' relating to training

within the Stamford Police Department as to the internal affairs complaints process consists of two entries within the Stamford Police Department Manual of Procedure. One entry refers to the duty of officers during the "late tour" and the "midnight tour" to serve as the primary complaints officer when not engaged in other activity. [Dkt. #160, Ex. 58, Stamford Police Department Manual of Procedure, Procedure No. 150, ¶17]. The Plaintiffs have also submitted Stamford Police Department Manual of Procedure, Procedure No. 2012, the Complaint Policy, recording the policy as follows: "Thorough investigation of all complaints, together with fair and impartial evaluations of findings, serves to protect the department and the public against acts of misconduct by police personnel and affords protection of police personnel against invalid charges made by the public." [Dkt. #160, Ex. 12, Stamford Police Department Manual of Procedure, Procedure No. 2012].

The Court finds that this evidence falls short of the standard for failure to train municipal liability set forth by the Supreme Court in *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), requiring the identification of a specific deficiency in the training program closely related to the ultimate injury which actually caused the purported constitutional deprivation. *City of Canton*, 489 U.S. at 370. In *City of Canton*, the Supreme Court emphasized the need for a plaintiff raising a claim of failure to train municipal liability to establish that "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible," as distinguished from a situation where a particular officer was unsatisfactorily

trained in order to avoid imposing a kind of *de facto respondeat superior* liability on the municipality. 438 U.S. at 390-392.

The Plaintiffs have failed to include any evidence regarding training at the Stamford Police Department related to the submission of internal affairs complaints other than several entries in the Stamford Manual of Procedure. Absent any evidence whatsoever of the actual training process regarding the submission of internal affairs complaints, the Court finds that the Plaintiffs cannot sustain a claim of municipal liability on the basis of a failure to train. Accordingly, the Court grants summary judgment for the Defendants as to Count Plaintiffs' claims against the City of Stamford.

### G.  Connecticut Common Law Recklessness and Negligence

In Count Seven, the Plaintiffs allege that the Defendants conduct violated Connecticut State law by engaging in reckless and negligent conduct against Plaintiffs. In Count Twelve, the Plaintiffs raise a redundant claim, asserting that the Defendants violated Plaintiff's state law right to be free from reckless and negligent conduct.  The Court will consider these claims together, and treat them as a single cause of action.

#### i.  Recklessness

Under Connecticut law, recklessness is defined as "a state of consciousness with reference to the consequences of one's acts . . . It is more than negligence, more than gross negligence . . .[I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid dangers to other or to take reasonable precautions to

avoid injury to them . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the actions." *Craig v. Driscoll*, 262 Conn. 312, 813 A.2d 1003, 1022 (Conn. 2003) (internal citations omitted). Reckless conduct "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.*

Given the material factual dispute regarding the amount and reasonability of force applied by the Defendants to Mr. and Mrs. Nelson, summary judgment is denied as to the Plaintiff's claim of common law recklessness against Defendants Dogali, Scanlon, Connelly, and Fitzgibbon. Count Seven, alleging a claim of common law recklessness, will proceed to trial.

### ii. Negligence

Plaintiffs have raised claims of common law negligence, and negligent infliction of emotional distress against the Defendants. As previously discussed, the Plaintiffs raised parallel claims of common law negligence in Counts Seven and Count Twelve, which the Court has consolidated into one claim. In Count Ten, the Plaintiffs raise a claim of Negligent Infliction of Emotional Distress. The Defendants argue that each of the acts complained of by the Plaintiffs involved the exercise of discretion, and therefore the Defendants actions are protected by the doctrine of governmental immunity.

As the District Court of Connecticut has recognized, "the common-law doctrines 'that determine the tort liability of municipal employees are well established . . . Generally, a municipal employee is liable for the misperformance

36

of ministerial acts, but has a qualified immunity in the performance of governmental acts . . .Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. The hallmark of a discretionary act is that it requires the exercise of judgment. In contrast, [m]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion.' " *Odom v. Matteo*, 772 F.Supp.2d 377 (D.Conn. 2011) (citing *Martel v. Metropolitan District Comm'n*, 275 Conn. 38, 48-49, 881 A.2d 194 (2005).

However, this immunity is not without limitation. Connecticut recognizes three exceptions to a municipal employee's discretionary act immunity: "First, liability may be imposed for a discretionary act when the alleged conduct involves malice, wantonness, or intent to injure. Second, liability may be imposed for a discretionary act when a statute provides for a cause of action against a municipality or a municipal official for failure to enforce certain laws. Third, liability may be imposed when circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an unidentifiable person to an imminent harm . . ." *Doe v. Petersen*, 279 Conn. 607, 615-16, 903 A.2d 191 (2006).

"Connecticut courts have held that where, as here, an officer is alleged to have used excessive force against a person, he may be found to have subjected an identifiable person to imminent harm and therefore is not protected from suit by the doctrine of governmental immunity." *Odom*, 772 F.Supp. at 395. Given the material factual dispute regarding the amount and reasonability of force applied

to the Plaintiffs, "a jury could find, based on its determination of whether [the Defendants] used excessive force, that the circumstances made it apparent that [the Defendants'] acts . . . would likely subject an identifiable person, namely [the Plaintiffs], to imminent harm. *Ochoa v. City of West Haven*, No. 3:08-cv-00024 (DJS), 2011 WL 3267705, at *10 (D.Conn. July 29, 2011) (citing *Gilliam v. Town of Windsor Locks*, No. 3:03-cv-1201 (AVC), 2006 WL 581208 (D.Conn. March 7, 2006).

Accordingly, summary judgment is denied as to the Plaintiffs' negligence claims against Defendants Dogali, Scanlon, Connelly and Fitzgibbons. Counts Seven and Ten will proceed to trial.

### H.  Conn Gen. stat. §52-557n

In Count Thirteen, Plaintiffs raise a negligence claim against the City of Stamford pursuant to Conn. Gen. Stat §52-557n.  Conn. Gen. Stat. §52-557n(a)(1) provides that "a political subdivision of the state shall be liable for damages to person or property caused by . . . [t]he negligent acts or omissions of such political subdivision or any employee, officer, or agent thereof acting within the scope of his employment or official duties." However, the Connecticut Supreme Court, recognizing "the close relationship between §52-557n(a) and the common-law doctrines governing municipal employees' immunity," and seeking to create "a harmonious body of law governing municipal liability," has held that "the identifiable person, imminent harm common-law exception to municipal employees' qualified immunity also applies in an action brought directly against municipalities pursuant to §52-557m." *Grady v. Town of Somers*, 294 Conn. 394, 984 A.2d 684 (2009).

Accordingly, because Plaintiffs' negligence claims against the individual officers will survive summary judgment on the basis of the material factual dispute regarding the amount and reasonability of the force applied to the Plaintiffs, Plaintiffs' negligence claims against the City of Stamford will survive summary judgment as well.

### I.   Intentional Infliction of Emotional Distress

In Count Nine, Plaintiffs raise a claim of intentional infliction of emotional distress against the Defendants. The Defendants argue that Plaintiffs have failed to present sufficient evidence to establish any conduct rising to the level of extreme or outrageous to support such a claim. Further, the Defendants argue that Plaintiffs have failed to present evidence demonstrating that they sustained severe emotional distress as a result of any of the actions of the Defendants.

A plaintiff seeking to establish a claim of intentional infliction of emotional distress must show: "(1) the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000)(internal quotation marks omitted).

"Under Connecticut law, before a claim for intentional infliction of emotional distress may be submitted to a jury, the court must first determine that the conduct may be reasonably regarded as "extreme and outrageous so as to

permit recovery." *Birdsall v. City of Hartford*, 249 F.Supp.2d 163 (D.Conn. 2003) (citing *Reed v. Signode Corp.*, 652 F.Supp. 129, 137 (D.Conn. 1986) The case should only be submitted to the jury if the court determines that reasonable minds may differ as to whether or not the conduct was extreme and outrageous. *Reed*, 652 F.Supp. at 137. "Connecticut courts have held that emotional distress is severe when it reaches a level which 'no reasonable person could be expected to endure.' " *Birdsall*, 294 F.Supp. at 175-76 (citing *Mellaly v. Eastman Kodak*, 42 Conn. Supp. 17, 597 A.2d 846 (1991).

### i.  Mr. Nelson

The material submitted by Mr. Nelson in opposition to summary judgment is completely devoid of any evidence to substantiate a claim of severe emotional distress. Mr. Nelson has not presented any medical records demonstrating that he sought or received treatment for emotional distress, nor has he presented any sworn statements on his own behalf in the form of deposition testimony or an affidavit indicating that he has suffered from severe emotional distress. Further, Mr. Nelson admitted, in his Rule 56(a)(2) Statement that he "received no medical treatment for emotional distress arising out of his arrest on October 22, 2006, and he has no  history of mental health problems." [Dkt. #159, Ex. 1, Pl. Edward Nelson Rule 56(a)(2) Stmt., ¶35].  Although "the absence of treatment does not preclude proof of severe emotional distress," whereas here, absolutely no evidence has been submitted indicating that Mr. Nelson suffered severe emotional distress, or any emotional distress whatsoever, as a result of the

Defendants' conduct, summary judgment is warranted. *Birdsall*, 249 F.Supp. at 175.

### ii.  Mrs. Nelson

Unlike Mr. Nelson, Mrs. Nelson has submitted several pieces of evidence to substantiate a claim of severe emotional distress. Mrs. Nelson's deposition testimony reports that she was "traumatized by the whole event." [Dkt. #160, Ex. 32, Deposition of Patricia Nelson, 14:14]. Further, a medical report from the Westchester Medical Center dated April 20, 2011 indicates that Mrs. Nelson is "struggling emotionally and legally" as a result of the incident in October, 2006. [Dkt. #160, Ex. 13, Westchester Medical Center, Outpatient Progress Note]. The report further states that Mrs. Nelson has difficulty sleeping and has experienced "passive suicidal ideation," and lists diagnoses of "Major Depressive Disorder, Recurrent, Moderate 296.32 (Chronic)" and "Post-Traumatic Stress Disorder 309.81 (With delayed onset, Chronic)." [*Id.*]. The Defendants have produced no evidence that these conditions predate or were caused by conditions or events other than her arrest.

Given the material factual dispute regarding the amount and reasonability of force applied by Defendant Connelly to Mrs. Nelson, reasonable minds could differ as to whether or not Defendant Connelly's conduct was extreme and outrageous. *See Ochoa*, 2011 WL 3267705, at *11 (declining to grant summary judgment as to plaintiff's claim of intentional infliction of emotional distress on the basis of a material factual dispute regarding plaintiff's excessive force claim). Further, post-traumatic stress disorder, including suicidal thoughts and difficulty

sleeping are sufficiently serious conditions that a reasonable juror could find that they amount to severe emotional distress.

Accordingly, summary judgment is denied as to Count Nine, a claim of Intentional Infliction of Emotional Distress raised by Mrs. Nelson against Defendant Connelly.

### J.  Indemnification under Conn. Gen. Stat. §7-465

In Count Fourteen, Plaintiffs seek indemnification under Conn. Gen. Stat. §7-465. Conn. Gen. Stat. §7-465 provides that:

> "[a]ny town, city, or borough ... shall pay on behalf of any employee of such municipality ... all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property ... if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any willful or wanton act of such employee in the discharge of such duty ... Governmental immunity shall not be a defense in any action brought under this section."

"§7-465 is an indemnity statute; it does not create liability." *Faulks*, 2010 WL 259076, at *15. Under §7-465, "the obligation imposed is indemnification for the legal liability arising out of certain tortious conduct of the municipal employee." *Ahern v. City of New Haven*, 190 Conn. 77, 92, 459 A.2d 118 (1983). A municipality's duty to indemnify "attaches only when the employee is found to be liable and the employee's actions do not fall within the exception for willful and wanton acts." *Myers v. City of Hartford*, 84 Conn. App. 395, 400, 853 A.2d 621 (2004). A plaintiff seeking indemnification under §7-465 must first "allege in a separate count and prove the employee's duty to the individual injured and the

breach thereof. Only then may the plaintiff go on to allege and prove the municipality's liability by indemnification." *Sestiso v. City of Groton*, 178 Conn. 520, 527, 423 A.2d 165 (1979).

Plaintiffs are not entitled to indemnification from the City of Stamford where no judgment has yet been entered in their favor against any of the Defendants, municipal employees of the City of Stamford. Accordingly, summary judgment is premature as to Count Fourteen.

### K.  Fourth Amendment Strip Search

Plaintiffs both allege that they were subjected to illegal strip searches in violation of the Fourth Amendment while in the custody of the Stamford Police Department.  The Defendants argue that, according to the definition of a strip search set forth in Conn. Gen. Stat. §54-33k, the Defendants did not conduct a strip search of either Mr. Nelson or Mrs. Nelson.  Rather, the Defendants contend that the searches were conducted pursuant to Stamford Police Department policy requiring that during the processing of prisoners, officers are to confiscate "all items that can be used as a weapon, or anything that a prisoner can injure themselves with. So it is policy that all shoelaces, belts, extra clothing, brassiers, sharp jewelry, everything must be removed." [Dkt. #160, Ex. 28, Deposition of Sergeant Fitzgibbons, 37:14-20] Further, Defendants argue that the Defendants are protected by qualified immunity because they assert that the searches conduct did not violate either the Plaintiffs' constitutional rights or clearly established law.

The Defendants' reliance on the definition of a strip search under Connecticut law is misplaced, as Plaintiffs' claims regarding illegal strip searches have both been raised under the Fourth Amendment pursuant to 42 U.S.C. §1983.

Under the Fourth Amendment, the reasonableness of any search incident to arrest depends on the manner in which it was conducted. *See Wilson v. Aquino*, 233 Fed. Appx. 73 (2d Cir. 2007) (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In *Bell v. Wolfish*, the Supreme Court instructed that this reasonableness analysis requires a "balancing of the need for the particular search against the invasion of the personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. at 559.

In *Wolfish*, the Supreme Court applied this balancing test to the context of a prison policy requiring pre-trial detainees in a short-term custodial facility in New York City to undergo visual body-cavity inspections after every contact visit with a person from outside the institution. *Id.* at 558.  The *Wolfish* Court concluded that "the security interests of the prison in undertaking strip/body cavity searches after "contact" visits outweighed the privacy interests of the inmates-prisoners who had already been arraigned, had failed to make bail, and had presumably chosen to receive visitors and to enjoy physical contact with them." *Weber v. Dell*, 805 F.2d 796 (2d Cir. 1986) (citing *Bell v. Wolfish*, 441 U.S. at 546.

Relying on *Wolfish*, the Court will examine the reasonableness of the searches of Mr. and Mrs. Nelson separately, applying the following factors: (1) the place in which the search was conducted; (2) the scope of the particular intrusion; (3) the manner in which the search was conducted; and (4) the justification for initiating the search. *Bell v. Wolfish*, 441 U.S. at 559.

      i.     Mrs. Nelson

          a.  Place in which the Search was Conducted

The search of Mrs. Nelson was conducted in a single person female cell in the Stamford Police Department in the presence of two male officers and one female officer. There was a video security surveillance camera capturing the activity inside the cell which recorded the activity in the cell. There is no indication from the video recording of the search that this setting was in any way inadequate to protect Mrs. Nelson's privacy interests, nor does Mrs. Nelson allege in her complaint, affidavit, or deposition testimony that she was exposed, at the time of the search, to anyone other than the three officers in attendance.

Several cases have held that requiring a woman to expose her breasts constituted a strip search due to the fact that the woman was exposed, at the time of the search, to individuals other than the officers conducting the search. *See e.g., Masters v. Crouch*, 872 F.2d 1248 (6th Cir. 1989) (woman was required to expose her breast area "in front of a window in a holding room, in plain view of other persons"); *see also Leinen v. City of Elgin*, No. 98-c-8225, 2000 WL 1154641, at *1, (N.D.Ill., Aug. 15, 2000) (woman was instructed to life her shirt and

brassiere, exposing her breasts, while in front of a window and visible to people in the booking area).

Here, the search of Mrs. Nelson was conducted in a female cell in the presence of the three officers conducting in the search. The record is completely devoid of any indication that Mrs. Nelson was exposed to anyone other than the participating officers.

The video tape of the search shows that Mrs. Nelson was severely inebriated, uncooperative, erratic, and belligerent. It is apparent from the video that a single female officer would not have been able to conduct a search of Mrs. Nelson and that it was difficult for three officers to search her.

### b. Scope of the Particular Intrusion

Mrs. Nelson contends that the scope of the search was unreasonable on the basis that her breasts were exposed to the view of the officers, and because she alleges that "Sergeant Fitzgibbons had his hands inside the side of my pants touching my buttocks for no other reason than to humiliate me." [Dkt. #159, Ex. 25, Affidavit of Patricia Nelson, ¶¶ 9-10].

Defendants argue that the search of Mrs. Nelson should not be characterized as a strip search because although the video reveals that her breasts were exposed, they contend that no visual search of her breasts was undertaken, demonstrated by the fact that during the time that the officers were in the cell, Mrs. Nelson was lying face down, and her breasts were not exposed, rather Mrs. Nelson was only sitting upright or standing after the officers had left the cell. Moreover, Defendants argue that the video shows that the officers left a

shirt on the bed next to Mrs. Nelson when they exited the cell which Mrs. Nelson could have put on to cover her breasts.

Pursuant to *Bell v. Wolfish*, the Second Circuit has held that "the term 'strip search' is generally used to describe any inspection of the naked body." *Kelsey v. County of Scoharie*, 567 F.3d 54, 62 (2d Cir. 2009) (citing *N.G. v. Connecticut*, 382 F.3d 225, 228 n.4 (2d Cir. 2003).

In *Reinhart v. City of Schenectady Police Dept.*, the court analyzed a very similar factual scenario, involving a woman arrested for misdemeanor who, upon placement in a holding cell at the local police station pending arraignment, was instructed to remove her brassiere pursuant to a Schenectady Police Department policy requiring all females to remove their brassieres when placed in a holding cell for the safety of inmates and to prevent suicide. 599 F.Supp.2d 323 (N.D.N.Y. 2009). Relying on a discussion by the Second Circuit of the meaning of the word "search," and focusing on the limited scope of the incident, the court found that the plaintiff had mischaracterized her claim as one asserting an illegal strip search, instead holding that removal of the brassiere at the officer's direction, constituted a seizure. However, the Second Circuit discussion of the word "search" was extracted from *United States v. Snow*, 44 F.3d 133 (2d Cir. 1995), which analyzed the meaning of the word "search" in the context of an individual's consent to a search of his car. The Second Circuit found that:

> The word "search" carries a common meaning to the average person. Dictionary definitions furnish some guide: "to go over or look through for the purpose of finding something; explore; rummage; examine," "to examine closely and carefully; test and try; probe," "to find out or uncover by investigation." Webster's New

> World Dictionary 1210 (3d ed. 1988). The Oxford English
> Dictionary (2d ed. 1989) is not much different:
> "examination or scrutiny for the purpose of finding a
> person or thing," "look through, examine internally (a
> building, an apartment, a receptacle of any kind) in
> quest of some object concealed or lost." *Id.* at 804, 805.
> Thus, under either the King's or the Colonists' English,
> the term "search" implies something more than a
> superficial, external examination. It entails "looking
> through," "rummaging," "probing," "scrutiny," and
> "examining internally."

The Second Circuit concluded, given the various meanings of the term "search," that "an individual who consents to a search of his car should reasonably expect that readily-opened, closed containers discovered inside the car will be opened and examined." *Snow*, 44 F.3d at 135.

The Court finds the *Reinhart* court's reliance on the Second Circuit's discussion of the meaning of the word "snow" within the context of consent to a car search is misplaced. In *Wilson v. Aquino*, the Second Circuit made clear that "the reasonableness of *any* search incident to arrest" depends on "the manner in which it was conducted," referring to the reasonableness test set forth by the Supreme Court in *Bell v. Wolfish*. 233 Fed.Appx. at 1 (emphasis added). Moreover, the plain language of one of the definitions of "search" discussed by the Second Circuit in *Snow* includes the phrase "to go over or look through for the purpose of finding something," which is precisely the behavior in which the three officers participating in the search of Mrs. Nelson were engaged.  Defendant Fitzgibbons stated in his deposition that the purpose of the search was to "try to remove anything that she could strangle herself with," including "shoelaces, belts, extra clothing, brassieres, sharp jewelry, everything must be removed." [Dkt. #160, Ex.

28, Dep. of Sergeant Fitzgibbons, 37:6-20].   Accordingly, the Court will analyze the nature and scope of the search by referring to other cases examining the exposure or partial exposure of an individual's body under the reasonableness test set forth by the Supreme Court in *Bell v. Wolfish*.

Several other circuits have held that an individual need not have been fully undressed for the search to be characterized as a strip search. *See, e.g., US v. Edwards*, 2011 WL 6825360 (4th Cir. Dec. 29, 2011); *see also Wood v. Hancock Cnty. Sheriff's Dep't*, 354 F.3d 57, 63 n.10 (1st Cir. 2003) (finding that "a strip search may occur even when an inmate is not fully disrobed").  The Fourth Circuit in *US v. Edwards*, found the Supreme Court's analysis in *Safford Unified School District No. 1 v. Redding*, --- U.S.---, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) to be instructive. *See US v. Edwards*, 2011 WL 6825360, at *4. In *Safford*, the Supreme Court held that a search of a student requiring the student to "remove her clothes down to her underwear, and then 'pull out' her bra and the elastic band on her underpants . . . in the presence of two officials who were able to see her necessarily exposed breasts and pelvic area to some degree," constituted a strip search. 129 S.Ct. at 2641.

Here, the video exhibit submitted by both Plaintiffs and Defendants undeniably shows that Mrs. Nelson's breasts were exposed when her shirt was removed, her brassiere removed, and her tank top pulled beneath her breasts. Moreover, Mrs. Nelson alleges that Defendant Sergeant Fitzgibbons "had his hands inside the side of my pants touching my buttocks for no other reason than to humiliate me."

49

Even construing the facts in favor of Mrs. Nelson as the Court is required to do on summary judgment, the Court finds that the search did not constitute a strip search. Unlike the cases previously discussed involving the exposure of a woman's breasts under circumstances in which the woman was exposed to more people than simply the officers conducting the search, there is no indication that Mrs. Nelson's breasts were exposed to anyone other than the three officers conducting the search. *See Masters*, 872 F.2d 1248; *see also Leinen v. City of Elgin*, 2000 WL 1154641, at *1. However, the mere fact that the search does not constitute a strip search does not conclude the inquiry regarding the reasonableness of the search. The scope of the search is simply one of the factors to be weighed by the Court in determining the reasonableness of the search under the test set forth in *Wolfish*.

### c.  Manner in which the Search was Conducted

The video recording of the search, submitted as an exhibit by both the Plaintiffs and the Defendants, shows that the search of Mrs. Nelson was conducted by three officers. Two male officers held Mrs. Nelson by her arms, while a female officer wearing plastic gloves conducted the search, including the removal of Mrs. Nelson's shirt and brassiere.

However, Mrs. Nelson contends her in affidavit that the male officers had more involvement in the search than simply restraining her. Mrs. Nelson alleges that her clothing was removed "at the order of Sgt. Fitzgibbons who assisted PO Sandra Connetta and PO James Herbert with removing my clothing and exposing my breast to the view of these officers." [Dkt. #159, Ex. 25, Affidavit of Patricia

Nelson, ¶9].  Mrs. Nelson further contends that "Sgt. Fitzgibbons had his hands inside the side of my pants touching my buttocks for no other reason than to humiliate me." [*Id.* at ¶10]. Defendants have not offered any statement by Defendant Sergeant Fitzgibbons denying that he placed his hands inside Mrs. Nelson's pants and touched her buttocks. Nor have the Defendants offered any statement contradicting Mrs. Nelson's allegation that PO James Herbert was involved in the removal of her clothing.

What is apparent from the video tape is the fact that Mrs. Nelson's behavior dictated the manner in which the search was conducted. Her conduct necessitated a heightened degree of police action. She was severely intoxicated, highly agitated, belligerent and uncooperative. She was using profanity and impeding the officer's efforts to conduct a search of her person. Her behavior necessitated the placement of her back down on the cell bed in order to complete the search. Her erratic behavior made it difficult at best for the officers conducting the search to totally control how and where they came into contact with her person.

The Court must also consider the fact that the search was cross-gendered. The reasonability of cross-gendered searches is a complex and developing area of law and has been the focus of discussion for standard and law making bodies, including the American Bar Association in revising its Standards on the Treatment of Prisoners and the Department of Justice in drafting the forthcoming Prison Rape Elimination Act Standards. *See* Robyn Gallagher, *Constitutional Law—Cross-Gender Pat Searches: The Battle Between Inmates and Corrections*

*Officers Enters the Courtroom*, 33 W. New Eng. L. Rev. 567 (2011).  In *Colman v. Vasquez*, another court in this District addressed the constitutionality of cross-gender pat searches in the context of a female prisoner incarcerated in a special unit for victims of sexual assault who was forced to submit to pat searches by male guards. 142 F.Supp.2d 226 (D.Conn. 2001). The *Colman* court noted that " 'women experience unwanted touching by men differently from men subject to comparable touching by women.' " 142 F.Supp. at 232 (quoting *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993)).

Although the context of the cross-gender searches addressed by the court in *Colman* is different than the present case, the gender differences contained in Mrs. Nelson's allegation that one male officer assisted with the removal of her clothing, and another male officer placed his hands inside her pants and touched her buttocks are highly relevant to the analysis of the manner of the search.

### d.  Justification for Initiating the Search.

The Defendants' have offered the deposition testimony of Defendant Sergeant Fitzgibbons to set forth the justification for conducting the search of Mrs. Nelson. Defendant Sergeant Fitzgibbons testified that, "the purpose of what was happening on Mrs. Nelson is to take her property, not to search her. We're not looking for contraband, evidence or anything from a criminal case to further charge her with anything. All we were doing is trying to remove anything that she could strangle herself with." [Dkt. #160, Ex. 28, Deposition of Sergeant Fitzgibbons, 37:6-11]. Defendant Sergeant Fitzgibbons further testified that it is the "policy and procedure in the Stamford Police Department Headquarters

Division for the processing of a prisoner, that we're to take all items that can be used as a weapon, or anything that a prisoner can injure themselves with. So it is the policy that all shoelaces, belts, extra clothing, brassieres, sharp jewelry—everything must be removed."

The Defendants' purported purpose of removing potentially dangerous items on Mrs. Nelson's person is a legitimate one. *See Reinhart*, 599 F.Supp.2d at 334 (recognizing that "brassieres are seized purely as a safety measure to preclude their use as a suicide tool"). In fact, the Second Circuit has been presented with a case alleging, among other things, deliberate indifference to medical needs and negligence claims, stemming from a pre-trial detainee's death in police custody, having hung herself from the bars of her cell with a bra wrapped around her neck. *See Washington v. City of Binghamton*, 152 F.3d 922 (2d Cir. 1998). Moreover, the Defendants' interest in removing dangerous items from Mrs. Nelson's person was heightened given her hostile state and her erratic body movements, as shown on the video recording of her cell. Further, Mrs. Nelson was heavily under the influence of alcohol, as is apparent from her behavior on the video and is confirmed by the medical records submitted by Mrs. Nelson from the Stamford Hospital Emergency Department dated October 22, 2006 listing a diagnosis of "detox intox." [Dkt. #160, Ex. 46, Stamford Hospital Medical Records for Patricia Nelson]. It is possible given the extreme fitful demeanor displayed by Mrs. Nelson in the video and her erratic body movements that Mrs. Nelson may have been under the influence of additional control substances as well.

Analyzing all four factors as set forth by the Supreme Court in *Wolfish*, the Court finds that, while it is a very close call, a material factual dispute exists regarding the reasonability of the search of Mrs. Nelson conducted by the Defendants. A reasonable jury could conceivably find that the removal of Mrs. Nelson's shirt and brassiere by a female and a male officer and the touching of Mrs. Nelson's buttocks underneath her pants by a male officer, despite the Defendants' interest in removing dangerous items from Mrs. Nelson to ensure her safety constituted an unreasonable search in violation of the Fourth Amendment. Accordingly, summary judgment is denied as to Mrs. Nelson's claim of an unconstitutional strip search in violation of the Fourth Amendment.

Where, as here, facts material to the qualified immunity analysis are in dispute, summary judgment is not appropriate. *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary Judgment on qualified immunity is not appropriate when there are facts in dispute that are material to a determination of reasonableness."); *see also Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("summary judgment based on either the merits or on qualified immunity requires that no dispute about material factual issues remain").

        ii.    Mr. Nelson

Mr. Nelson claims that he was subjected to an unconstitutional strip search in the booking area of the Stamford Police Department. Specifically, Mr. Nelson claims that while in the booking area, his pants were removed and Defendant Sergeant Fitzgibbons raised his arms behind his back causing his back to bend downward and his penis to be exposed to the officers in the booking area,

causing a humiliating experience. [Dkt. #160, Ex. 16, Affidavit of Edward Nelson, ¶¶8-9].

The Defendants contend that although Mr. Nelson's shirt and pants were removed, Mr. Nelson remained in his underwear at all times. Further, Defendants argue that no search to retrieve contraband was conducted; rather, Defendants assert that Mr. Nelson's shirt and pants were removed to prepare him for transport to the hospital.

A video surveillance camera of the booking area submitted by both the Plaintiffs and Defendants recorded the search of Mr. Nelson. Mr. Nelson is shown in the booking area with six police officers. First, Mr. Nelson is shown removing his shoes, belt, and shirt at the instruction of the officers. Although Mr. Nelson is heard screaming, he complies with the instructions to remove these items of clothing. Then Mr. Nelson is placed onto the floor (as previously discussed in the context of Mr. Nelson's excessive force claim, it is unclear how much force is applied by the officers in order to place Mr. Nelson on the floor). Once on the floor, Mr. Nelson is held at his arms by two male officers and at the feet by one male officer and his pants are removed by another male officer. Mr. Nelson is then lifted to his feet in handcuffs and wearing only his underwear and is guided to a stretcher in the hallway.

Applying the definition of a strip search as articulated by the Second Circuit in *Kelsey*, defined as "any inspection of the naked body" the Court finds that Mr. Nelson was not subjected to a strip search. *Kelsey*, 567 F.3d at 62 (citing *N.G. v. Connecticut*, 382 F.3d 225, 228 n.4 (2d Cir. 2003)). Although Mr. Nelson's

shirt and pants were removed, the video of the booking area shows that the officers did not conduct a visual inspection of Mr. Nelson's naked body. Not only did Mr. Nelson remain in his underwear, but the officers do not conduct a visual inspection of his body.

However, the Court is required to analyze the reasonableness of the search under the balancing test set forth in *Wolfish*. *See Aquino*, 233 Fed.Appx. at 76 (holding that the reasonableness of any search conducted incident arrest depends on the manner in which it was conducted)(citing *Wolfish*, 441 U.S. at 559). The Court must consider "the scope of the particular intrusion, the manner in which it is conduct, the justification for initiating it, and the place in which it is conducted." *Wolfish*, 441 U.S. at 559.

The Court finds that applying the four-part balancing test and construing the evidence in the light most favorable to Mr. Nelson, no reasonable jury could find that the minimally intrusive removal of Mr. Nelson's shirt and pants constituted an unreasonable search and seizure in violation of the Fourth Amendment. Mr. Nelson's shirt and pants were removed in the presence of predominantly male officers. Although one female officer enters the room she does not assist with the removal of Mr. Nelson's clothes and she remains in the room only briefly. Further, during the female officer's presence in the room Mr. Nelson is seen standing with his underwear on his body, such that his genitals are not exposed. The search was conducted by all male officers, presenting no cross-gender issues.  Moreover, the search was no more intrusive than was necessary to achieve the purported goal of the Stamford Police Department

policy, to "take all items that can be used as a weapon, or anything that a prisoner can injure themselves with. So it is the policy that all shoelaces, belts, extra clothing, brassieres, sharp jewelry—everything must be removed." [Dkt. #160, Ex. 28, Deposition of Sergeant Fitzgibbons, 37:14-20].

Accordingly, summary judgment is granted as to Mr. Nelson's claim of an unconstitutional strip search in violation of the Fourth Amendment. Having found that no constitutional violation occurred, the Court need not address the Defendants' claims of qualified immunity. *See Anderson v. Lantz*, No. 3:07-cv-1689 (MRK), 2009 WL 2132710, at *7 (D.Conn. July 14, 2009) (declining to address defendants' claims of qualified immunity in light of the fact that no constitutional violation was found).

### L.  Conspiracy Claims

Plaintiffs both allege that the Defendants conspired to conceal alleged excessive force violations against the Plaintiffs by agreeing to omit certain facts from their reports and include other false information in the reports. [Dkt. #116, Third Amended Complaint, ¶¶63-64]. Defendants contend that Plaintiffs have failed to present evidence showing an agreement between any of the Defendants to inflict an unconstitutional injury.

To establish a conspiracy under §1983, a plaintiff must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). In *Ciambriello*, the Second

Circuit instructed that "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.*

The Court finds that the Plaintiffs have failed to present "even a scintilla of evidence regarding the existence, or even inference, of any specific agreement to violate Plaintiff's rights, whether such an agreement was entered into, the nature of the agreement, or specific acts in furtherance of the agreement." *Kramer v. City of New York*, No. 04-Civ-106 (HB), 2004 WL 2429811, at *7 (S.D.N.Y. Nov. 1, 2004). Accordingly, summary judgment is granted as to the Plaintiffs' claims of a conspiracy to violate their constitutional rights.

### M. Remaining Claims

To the extent that the Plaintiffs allege claims against Defendants Chief Brent Larrabee, Lieutenant Francis Cronin, Chief of Police Brent Larrabee, Lieutenant William Watrous, Officer Mark Ligi, Officer Brendetta Baines, Sergeant Christian DiCarlo, and Sergeant Louis DeRubeis, the Court grants summary judgment as to those claims as the Plaintiffs have failed to present evidence demonstrating these individuals personal involvement in any purported violation of the Plaintiffs' constitutional rights. *See Farrell*, 449 F.3d at 484 ("'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983'") (citation omitted). Moreover, the Court notes that Plaintiffs concede that

Lieutenant William Watrous had no personal involvement in this case. [Dkt. #159, Ex. 1, Pl. Edward Nelson Rule 56(a)(2)Stmt., ¶32]; [Dkt. #160, Ex. 1, Pl. Patricia Nelson Rule 56(a)(2) Stmt., ¶28].

Accordingly, summary judgment is granted as to any claims raised by Plaintiffs against these Defendants.

IV.     Conclusion

Based on the above reasoning, Defendants' [Dkt. #141, #144] motions for summary judgment against Edward and Patricia Nelson are GRANTED in part and DENIED in part.  Mr. and Mrs. Nelson's claims of excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. §1983, assault and battery under Connecticut common law, recklessness and negligence under Connecticut common law, negligent infliction of emotional distress under Connecticut common law, and negligence against the City of Stamford under Conn. Gen. Stat. §52-557n will proceed to trial. The claims of an unreasonable strip search in violation of the Fourth Amendment and intentional infliction of emotional distress will proceed to trial as to Mrs. Nelson only.  Summary judgment is granted as to all other claims.

                                        IT IS SO ORDERED.
                                        _____/s/_____
                                        Hon. Vanessa L. Bryant
                                        United States District Judge


Dated at Hartford, Connecticut: January 25, 2012